# THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* THE PRESIDENT, MANAGERS AND COMPANY OF THE BALTIMORE AND YORKTOWN TURNPIKE ROAD, AND THE CITY AND SUBURBAN RAILWAY COMPANY.

*Turnpike Companies—Cession of Roadbed to Baltimore City—Requisites of Cession—Changing Grade of Road—Police Power of the State—Equity Practice—City Solicitor.*

Under Code of Public Local Laws, Art. 4, sec. 818, when a Turnpike Company cedes to the city of Baltimore any portion of its road lying within the corporate limits, it thereby becomes a public street without any act of acceptance on the part of the municipal authorities.

This power to cede is not restricted to those portions of the turnpike roads which were within the city limits at the time the Act was passed, but the statute, being in general terms, includes the right to cede to the city such parts of the roads as are within the city limits as extended subsequently.

But when a Turnpike Company exercises this power, it must make the cession without the reservation of any rights, and the road ceded must not be burdened with any easements.

The defendant company executed and placed on record a deed to the Mayor and City Council of Baltimore granting and ceding to the city that portion of its road within the city limits, subject to certain railway franchises previously granted to other corporations. This deed was not accepted by the city. *Held*, that the deed should be declared null and void since the road ceded was burdened with easements in favor of the Railway Companies.

A Turnpike Company, incorporated in 1804, was authorized by charter to grade its road. Subsequently the limits of Baltimore City were extended so as to include a part of the road. The company graded its road so that it was made to run some feet below the surface of certain public streets intersecting the same. *Held,*

1st. That the charter of the company (having been granted without a statutory or constitutional reservation of the right to alter) could not be impaired by subsequent legislation; that consequently the right of the company to change the grade of its road continued, but that the exercise of this right was subject to the police power of the State.

2nd. That the municipality had a right to demand from the Turnpike Company compensation for the cost to be incurred in making the grade of said intersecting streets conform to the altered grade of the turnpike.

Where a bill in equity is filed by the city solicitor in the name of the Mayor and City Council, the presumption is that it was filed by their authority.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (WICKES, J.), dismissing the bill of complaint filed by the appellants. The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN McSHERRY, FOWLER, PAGE, ROBERTS and BOYD, JJ.

*Thomas G. Hayes, City Counsellor,* and *William S. Bryan, Jr., City Solicitor,* for the appellant.

Section 818 of Art. 4, Public Local Laws, does not in any way apply to the portion of the York Road between the present and the old city limits; that it must have meant the same now that it did when first enacted in 1825; and that then it obviously only applied to the portion of the roadbed within the old city limits.

The meaning and scope of this section was merely to enlarge the corporate capacity of the Turnpike Companies, and to prevent the cession of a portion of their road from being void as *ultra vires.* The familiar canon of construction that all grants are to be construed most strongly against the grantee has nowhere been more consistently

enforced than by this Court. *North Baltimore Passenger Railway Company* v. *North Avenue Railway Company*, 75 Md. 243. "Doubts as to what is granted are resolved in favor of the grantor, or, as often epigrammatically said, a doubt destroys a grant." *Horse R. Co.* v. *Interstate, &c., Co.*, 24 Fed. Rep. 308.

The word "cede" is synonymous with *grant* and does not mean the same thing as *abandon.* "May cede" is not a mandate to the city to take.

This deed on its face shows that the attempt is made not to give the *whole* bed of the turnpike as it existed when the law was passed, but to give the bed of the road subject to the dominant servitude created or attempted to be created in the Street Railway Company by the deed of grant from the Turnpike Company of 1891. If the city was to accept this deed, it is to say the least, very doubtful whether they would not be estopped from questioning the legality of any of these covenants. *Fulford* v. *Keerl*, 71 Md. 397; *Mahoney* v. *Mackubin*, 54 Md. 268; *Hough* v. *Horsey*, 36 Md. 184. It might be that the Legislature could have intended to force the city to take the *whole* of a portion of a road unencumbered by entangling grants and covenants, and at the same time have been utterly unwilling to force them to take a piece of road loaded down with easements and other private rights which might in the future be extremely detrimental to the public.

The charter of the York Road Co. gave it the right to change the grade of the road. But it is contended that this power does not exist within the city limits. That the power given to the City Council in sections 806 to 819 A of Art. 4, Code of Public Local Laws, is exclusive in its nature. A turnpike is a public highway. The only differences between it and ordinary highways are two. 1st. A private corporation has cast upon it the duty of keeping the turnpike in repair. 2d. In consideration of this duty it has the privilege of collecting tolls from all persons using it. *Angell on Highways*, sect. 9; *Elliott on Streets and Roads*,

p. 53 ; *Hiss* v. *Balto. & H. R. R. Co.*, 52 Md. 254. As said by JUDGE DORSEY in delivering the opinion in *Dugan* v. *Baltimore* (5 Gill & Johns. 375): "All our turnpike roads are common highways, and free for the public use, but not free from the collection of tolls."

Fixing the grades of public highways and determining whether the public convenience or the public health require that these grades shall be changed from time to time, is obviously a matter of police regulation.   Being a matter of police regulation, the Legislature of 1804 could not have made any valid contract with the Turnpike Company in its charter that it should forever have the right to change the grade of its road ; the most it could do, the most it was the agent of the public to do, was to give the Turnpike Company a permissive license, revocable at any time, to fix and alter grades.   See *Chicago Lake Front case*, 146 U. S. 387 ; *Lake Roland case*, 77 Md. 352 ; *North Balto. Co.* v. *Baltimore*, 75 Md. 250 ; *N. Y. Co.* v. *Bristol*, 151 U. S. 567.

It has been flatly decided in other jurisdictions, that where land is within the limits of an incorporated town, which has its local paving and grading laws, the general laws of the county or State, in regard to grading and repaving of roads do not apply, and that if the county supervisor attempts to repair the road he is a trespasser.   *State* v. *Mainey*, 65 Indiana, 404 ; *Town of Ottawa* v. *Walker*, 21 Illinois, 605 ; *Macullum* v. *Black Hawk Co.*, 21 Iowa, 411 ; *State* v. *Jones*, 18 Texas, 874.

And this Court itself has recognized the doctrine we here contend for in two recent decisions.   " It has for a long time been recognized as the law that the Mayor and City Council of Baltimore have *full and complete control* over the streets and highways of the city."   *Lake Roland R. R. case*, 77 Md. 357.   " The power of the Mayor and City Council of Baltimore over the streets cannot be regarded as within the region of debate."   *Postal Telegraph Co.'s case*, 29 Atlantic Rep. 891.

If the changing of the grade had been lawful, it would still

have been unlawful to so do the work as to leave the cross streets in a useless and dangerous condition. It is clear law that when a new way or road is to cross another it must be done with as little injury as possible to that other. *N. C. R. Co.* v. *Baltimore,* 46 Md. 425. And the same must be true when the grade of an existing way is to be changed. So that even if the turnpike company had had the right to do the grading, and it had been done in good faith for the benefit of the Turnpike Company, it would still have been unlawful to have done it as it was done, and to have left the cross streets without adequate and proper means of egress and ingress.

*E. D. J. Cross* (with whom was *John K. Cowen* on the brief), for the appellees.

There are two questions presented by the appeal in this case: (1.) The right of the Turnpike Company to make the deed of cession; and (2) the authority of the city to file the bill in its present form.

It is submitted that under the provisions of the Public Local Code the Turnpike Companies within the city limits have the right at any time to cede the same to the city, and that upon such cession they become immediately the public streets of the city. It is not necessary to inquire into the intent of the Legislature in passing the Act of 1825 and the codification of 1860. The Legislature, in its authority to control the city, could direct the city to acquire by purchase, condemnation or cession, the portions of the turnpikes within its limits, the object being to give municipal control over that portion of the highways within its boundaries, and to relieve the public from the onus of the charges for the use of the same. *Pumphrey* v. *M. & C. C. of Baltimore,* 47 Md. 145; *M. & C. C. of Baltimore* v. *Reitz,* 50 Md. 581; *O'Brien* v. *County Commissioners of Baltimore County,* 51 Md. 23.

It is not an objection to the grant that the rights of the Street Railway Company in the portion of the turnpike should be reserved by the deed, because these rights were

created by the Legislature, were acquired by the Turnpike Company under the authority of the Act of 1860, and by the expenditure of the large amount of money necessary to construct the railway; and the Turnpike Company had the authority under the Act of 1872, chapter 337, to sell to any other corporation these rights and franchises, and the other corporation had the right to receive them and to exercise them, and this right was not subject to the control of the Mayor and City Council. The portion of the turnpike not so occupied remained a turnpike in its entirety, with the right of those who used the same to enjoy the improvements put thereon at this large expenditure. The construction by the Street Railway Company of its track on the turnpike did not render the turnpike any less a public highway, and it did not cease thereby to be a turnpike. The objection, alleged by the city, to the grant, because the grade of the same was lower than certain intersecting streets, we submit, has no force. This change of grade was done under the charter power of the company, and has been recognized as a valid exercise of that power by this Court in the recent case of Green *v.* this defendant.

*Second.*—The bill of complaint was filed subsequent to the grant. The Mayor did not bring the matter to the attention of the City Council, but the bill was filed by the Mayor, without any authority from the City Council. It is submitted that it was the duty of the city authorities, when the deed was made, if the same should not be acceptable to them, to have had the action of the legislative portion of the municipality upon the matter, and that the Mayor, *ex officio*, has not the authority to reject a grant, made in conformity to law, and the right to litigate, in the name of the Mayor and City Council, does not reside in the Mayor alone; and it is for this reason that the supplemental answer was filed on the 18th of September, 1894, bringing this matter to the knowledge of the Court, and that the Court could not have jurisdiction to consider the bill of complaint, unless it had been properly filed. A suit

in the name of the municipality, instituted without authority, will be dismissed by a Court. *Kankakee* v. *R. R. Co.*, 115 Ill. 88; *Dillon Mun. Corp.*, sec. 479.

ROBINSON, C. J., delivered the opinion of the Court.

The Baltimore and Yorktown Turnpike Company was incorporated by the Act of 1804, chapter 51, to build and maintain a turnpike road from the city of Baltimore to the Pennsylvania line.

By the Act of 1860, chapter 209, the company was authorized and empowered to build a passenger railway on its road-bed from Baltimore to Towsontown. Having built and operated the street railway for a number of years, the company, under power conferred by the Act of 1872, chapt. 337, sold and conveyed to the Baltimore Union Passenger Railway Company the franchises, rights and privileges of the street railway conferred upon it by the Act of 1860.

Having thus disposed of the street railway, the Turnpike Company, by its deed dated 19th October, 1893, conveyed to the Mayor and City Council of Baltimore that part of its road lying within the city limits, as extended under the Act of 1888; *subject, however, to the grant* made to the Baltimore Union Passenger Railway Company of the franchises, rights and privileges of the street railway, and subject also to the rights of the City and Suburban Railway Company, its successor.

The right thus to surrender this portion of its road is claimed by the Turnpike Company under the Act of 1824, chapt. 105, codified as Sect. 818, Art. 4 of Public Local Laws for Baltimore City, which provides: "The president, directors and companies of the different Turnpike Companies owning roads running into the city of Baltimore may cede to said city such parts of said roads as lie within the corporate limits of said city, and the same, when ceded, shall be in all respects subject to the same regulations as unpaved public streets."

This deed, however, the city authorities refuse to accept, and they insist that the word "cede," as used in the Act, is synonymous with and to be interpreted in the same sense as the word "grant," and being a grant, the deed is inoperative until it has been accepted.   And we have been referred to quite a number of dictionaries, as to the meaning of a word in no sense a technical word, but one in every-day use, and about which there ought not to be any difficulty as to its natural import and meaning.   Like many other words, its precise meaning and signification depend somewhat upon the subject-matter in connection with which it is used.   In some instances, it may, it is true, be used in the sense of "grant," but ordinarily it means to "yield," "surrender," "give up."   But this, however, is not merely a dictionary question.   We are dealing with an Act of the Legislature, conferring upon a Turnpike Company the power to cede to the city that part of its road lying within the corporate limits; and which, when ceded, the Act declares shall be a public street.   There can be no difficulty, it seems to us, as to its meaning thus used.   The Turnpike Company having accepted its charter and having built its road, could not at its own pleasure "cede" or "surrender" any portion of its road, unless by power conferred by the Legislature.   Nor could the city, however desirable it might be, acquire any part of turnpike road within its corporate limits except by purchase or by condemnation.   And this being so, the object and sole object of the Act was to confer this power upon the Turnpike Company, should it deem it advisable to surrender any part of its road to the city.   It was never supposed for a moment that there would or could be any objection on the part of the city authorities to a surrender of the road thus made without *compensation*, by which a *toll-road within the city* limits was thereby made a *free highway*.   And hence the Act declares that the portion of the turnpike thus ceded shall thereupon become a public street.   All the Act requires or means is that the Turnpike Company shall cede to the city the portion of its road lying within the cor-

porate limits, and when ceded, the road, by operation of the Act itself, becomes a public street, and this too without any act of acceptance on the part of the city authorities by ordinance, resolution or otherwise.

But then again it is said the power to cede is limited to that part of road lying within the city limits at the time the Act was passed; and the Turnpike Company has no power, therefore, to cede that part of its road lying within the city limits, as extended by the Act of 1888. The Act does not so say in terms; on the contrary, the power is conferred in general terms, and it would, it seems, be a narrow construction of a power mainly conferred in the interests of the city itself. We cannot agree with the counsel for the appellant that the Legislature could not have foreseen that in sixty or seventy years the limits of the city would be extended two miles at least beyond the old city limits. We see no good reason for imputing such a want of foresight to the General Assembly. Baltimore was at that time a growing and prosperous city, and to any one of ordinary judgment, it must have been apparent, we think, that an extension of its limits at some time in the future would be absolutely necessary to its proper growth and development. Whether one mile or two miles, or even further, no one could tell, but any extension of its limits would necessarily include portions of some if not all of the several turnpikes then leading in every direction from the city. And as it would be to the interest of the city that these several turnpike roads should be converted into free highways, this power was not restricted to the portions of the roads within the city limits at the time the Act was passed, but was conferred in general terms, thereby enabling them to cede not only such portions, but also such parts of their roads as might be within the city limits, should the limits be thereafter extended.

·We come, then, to the last objection and one which it seems to us is fatal to the deed in question, and that is, the deed is made subject to the grant of the Turnpike Company to the Baltimore Union Passenger Railway Company of the

franchises, rights and privileges of the street railway, with the right on the part of the latter company to use, manage and enjoy such franchises *in perpetuity*, and subject also to all the rights of the City Suburban Railway Company, its successor.   The Act of 1824 does not make it obligatory on the Turnpike Company to cede any portion of its road to the city, but if it proposes to exercise the power thereby conferred, it must make the cession without the reservation of any rights either in his own behalf or of its assignees.   It has no right to surrender a part of its road burdened with easements which it claims the right to create in *perpetuity*.   The Act contemplated and by every fair rule of construction means that the turnpike shall be ceded *unencumbered*, and when so ceded the Act declares that it shall thereupon become subject to all the regulations applicable to unpaved public streets.   How far and to what extent this deed, made subject to the grant of the Turnpike Company to the Baltimore Union Passenger Railway Company, would affect the control of the city authorities over the portion of the road thus ceded, it may not be easy to determine.   It is sufficient to say, that if it would not in any manner interfere with their control over it as a public street, then it was altogether unnecessary to make the deed subject to this reservation, while, on the other hand, if it would interfere with such control, then the Turnpike Company had no right to surrender the road on such terms. And it is no answer to say the street railway was built and its franchises were sold under power conferred by the Legislature.   This may be true, but when these franchises and powers were granted the turnpike belonged to the company, and the portion of its road on which the street railway was built was at that time beyond the corporate limits and in no manner subject to the control of the city.   And whilst the extension of the city limits can in no manner affect the franchises and privileges granted to the Turnpike Company, in connection with the street railway, at the same time, if it proposes to cede to the city part of the turnpike now within the corporate limits, the cession must be made without

reservation as to easements created by it without the assent or concurrence of the city authorities.

And this brings us to the only remaining question, and that is: Whether the Turnpike Company has the right to grade its road within the city limits as extended by the Act of 1888. As a general rule the Mayor and City Council have the exclusive control of the highways and streets within the corporate limits. But the Turnpike Company was chartered by the Act of 1804, and there is no reservation in the charter itself, nor in any general law, nor in the Constitution then in force, reserving the right to amend or alter the charter thus granted. It became, therefore, a contract between the State and the corporators, within the protection of the Constitution of the United States, which forbids any State from passing laws impairing the obligation of contracts. Among the powers granted to the company was the right to grade its road, and this right we have said is a continuing right, to be exercised from time to time, as the necessities of the company or the public convenience may require. *Peddicord's case*, 34 Md. 463. Being then a chartered right, the extension of the city limits, so as to include part of the turnpike, could not interfere with or deprive the company of the lawful exercise of this right. Neither the city authorities nor the Legislature itself could deprive it of this right. At the same time, the exercise of this right is subject to the paramount governmental power, known as the police power, inherent in every well-organized government, and to be exercised when the safety and welfare of the community requires it. It is a power which the Legislature can neither alienate nor surrender, and every chartered privilege is granted on the implied condition that it is to be exercised subject to this power. As was said by Mr. Chief Justice Fuller, "It is likewise established that the inhibitions of the Constitution of the United States upon the impairment of the obligations of contracts, or the deprivation of property without due process of law, or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legis-

546   M. & C. C. OF BALTO. vs. TURNPIKE CO.

Opinion of the Court.                    [80

lative power in securing the public safety, health and morals. The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury." *N. Y. & N. E. R. Co.* v. *Bristol,* 151 U. S. 567.

Now, the proof shows that in grading its road within the city limits, the turnpike bed has been lowered from three to four feet below the surface of certain public streets which intersect the road. The public is entitled to the use of these streets for all the purposes for which they were opened and dedicated. It is entitled to the use of them in going to and from the turnpike road, and the company has no right to so grade its road as to endanger the safety of persons thus lawfully entitled to the use of the public streets. The grading has been done, and all the city now asks is to be reimbursed or compensated for expenses necessarily to be incurred in making the grade of the intersecting streets conform to the grade of the turnpike. And this we all agree the city authorities have the right to demand.

In the brief of the appellees the point is made that this bill has been filed without the lawful authority of the Mayor and City Council. It is filed by the city solicitor in the name of the Mayor and City Council, and in the absence of proof to the contrary, we must presume that it was filed by their authority. As to the City and Suburban Railway Company, we agree with the Court below, that the bill ought to be dismissed as to that company.

> *Decree affirmed in part and reversed in part, and cause remanded.*

(Decided February 28th, 1895.)