THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* THE UNITED RAILWAYS AND ELECTRIC COMPANY.

*Liability of Street Railway Company to Park Tax in Baltimore City— Neglect to Claim Right to Tax.*

The Acts of 1882, chap. 229, and 1894, chap. 550 (Baltimore City Charter secs. 797, etc.,) impose a park tax of nine per cent on the gross receipts of street railway lines within the city limits.    The ordinances granting the right to operate street railways had, prior to said Acts, provided that the companies should pay a certain percentage of their gross receipts accruing from passenger travel upon the railways within the city limits.    Previous to the extension of the limits of the city by the Act of 1888. chap. 98, certain railways, now constituent companies of the United Railways Company, had constructed lines on public roads in the adjacent county under legislative or county grants, and on roads in that county under private grants, which roads afterwards became public roads.    These roads since the annexation became streets of Baltimore City.    *Held*, that the railway company is liable for the park tax upon its gross receipts from all its lines operated upon public streets within the present city limits including the roads that were formerly county roads.

*Held,* further, that the railway company is not liable to the tax upon its receipts from lines constructed on turnpikes and other rights of way acquired by private grant, and which have not been made public streets.

The failure of a municipality for some years to assert its right to demand a franchise tax from a street railway company is not a bar to the recovery of the tax when the right is asserted.

*Decided January 8th, 1908.*

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER and BURKE, JJ.

*Edgar Allan Poe* and *Sylvan Hayes Lauchheimer* (with whom was *W. Cabell Bruce* on the brief), for the appellant.

*Joseph C. France* and *J. Pembroke Thom,* for the appellee.

*Geo. Stewart Brown* filed a brief as *amicus curiae.*

BOYD, C. J., delivered the opinion of the Court.

This is an action to recover from the appellee what is known as the "Park Tax" on receipts derived from its passenger business on portions of its railway, within the Annex of Baltimore City. As shown by three prayers offered by the appellant, it contends:

1st. That it is entitled to recover an amount equal to a tax of nine *per cent* upon the gross receipts of the defendant, derived from passenger traffic upon *all* its lines within the present city limits:

2nd. That it is at least entitled to recover that amount of the gross receipts so derived from all of the lines of the defendant, operated upon *public streets,* within the present city limits; and,

3rd. That if the other contentions be not sustained, it is entitled to that portion of the gross receipts, so derived from all the lines of the defendant, formerly owned by and forming

part the Baltimore City Passenger Railway Company, within the present city limits.

The case was tried before the Court, upon an agreed statement of facts, which admitted that for the quarter involved in the suit—April 1st, to June 30th, 1906—the company paid a park tax amounting to $104,447.01—being nine *per cent* of the total receipts from city tracks, and from those in the Annex not claimed to be exempt, which amounted to $1,160,522.42. The total passenger receipts for the quarter, from lines other than those in the county, were $1,383,228.07—those from the Annex on which exemption is claimed being $222,705.65. Omitting fractions, there are twenty-two miles of double track in the Annex, which are claimed to be exempt from the park tax, because fourteen of them are upon private rights of ways, two were constructed under private grants upon what subsequently became public streets of Baltimore County, and about six miles were constructed under grants from the Legislature and the County Commissioners of Baltimore County, before annexation.    The appellee does not deny its liability for this tax on the receipts derived from tracks authorized by grants from the city, since the annexation (in 1888), but it is stated in its brief that on such the tax has been regularly paid. The Court below rejected the three prayers offered by the city, and granted one offered by the defendant; "That the plaintiff has offered no evidence legally sufficient under the pleadings in this case to show that the right to construct and operate over the tracks, in respect of which the plaintiff claims park tax, was derived from the plaintiff; and the verdict should be for the defendant."   A verdict was accordingly rendered for the defendant, and from the judgment entered thereon this appeal was taken.

1. The history of this tax is interesting, and although it has for the most part heretofore been given by us in other cases, some of it must again be referred to, in order that we may keep before us the ordinances of the city and statutes applicable to the questions involved.    The figures stated above, showing the receipts for one quarter, suggest the importance

of the case to the respective parties, and will justify a reference to anything that may throw light on the question, although there be some repetition of facts, which may be found in previous decisions.

In 1859 certain individuals applied for the privilege of constructing a horse railway in Baltimore City, and an ordinance was passed providing for a four-cent fare. Mayor Swann vetoed the ordinance and suggested that the fare be raised to five cents, and that the additional cent be used for the establishment and improvement of the city boundary avenue and for a park or parks. An ordinance was then passed requiring the company, as it was called, to pay quarterly "one-fifth of the gross receipts accruing from the passenger travel upon said roads located within the city limits under this ordinance, or any extension of said limits which may be determined upon hereafter," &c. In 1862 the General Assembly, at the instance of those individuals, incorporated the Baltimore City Passenger Railway Company making it subject to the terms of the ordinance. In 1881 an ordinance granting the Central Railway Company the right to construct, operate and maintain its railway contained a provision requiring the payment, for the use of the park fund, of "twelve per centum of the gross receipts accruing from the passenger travel upon said railway within the city limits." The agreed statement says that: "The provision of the ordinance of the Central Railway Company given above, is typical of the provisions of the ordinances by which rights were granted in the old city limits to the various companies on whose tracks in the Annex, park tax was not paid by the defendant." Then by the Act of 1882, ch. 229, it was provided that in lieu of the twelve *per cent* tax: "the said several passenger horse railway companies shall pay to the Mayor and City Council of Baltimore a tax upon their gross receipts of nine *per cent*, to be paid at the same time and in the same manner as the tax of twelve *per cent* is now paid by said companies." The Act of 1888, ch. 98 (Annexation Act), provided that all streets, avenues or alleys in the Annex, *which shall have been legally condemned* as streets under the provi-

sions of statutes relating to streets in Baltimore County, "shall be held to be validly constituted streets of Baltimore City in all respects as if the same had been legally condemned as such by the Mayor and City Council of Baltimore." In ch. 628 of the Acts of 1890, there was a similar provision, in reference to streets, etc., in Baltimore County, acquired by deed or dedication, but that seems to have been omitted from the charter, which only applied to such streets, etc., as had been legally condemned by Baltimore County.

Then the Act of 1894, ch. 550, was passed which provided for an inspection of the books of the railway companies by the Park Commission, or its agents, and that "On default of any of the street railway companies operating street railway lines within the present city limits, in the payment of the park tax of nine *per centum* of the gross receipts for all street railway lines within the present city limits," for the time therein named a penalty of thirty *per cent* should be imposed. The Acts of 1882 and 1894 were embodied in the City Charter of 1898, being sections 797 to 800 inclusive, and do not materially change the language of those statutes.

In *Balto. Union Pass. Ry. Co. v. Balto.*, 71 Md. 405, the appellant had three railway lines, two of which were wholly within the city limits, but a half mile of the third extended into the county. The main question involved in that case was what proportion of the gross receipts of that company should be deducted before imposing the park tax, on account of the half mile of track. In passing on the question, this Court said; "Inasmuch as one of these lines extends beyond the city and into Baltimore County, the gross receipts from or on account of that portion of the track which is without the city limits ought not to pay any part of the *nine per centum* tax which *has been imposed for the privilege accorded by the city to the appellant of using its streets for railway purposes.*"

In what is known as *The Park Tax case*, 84 Md. 1, the city undertook to collect this tax from the company, on the part of its railway which ran for about two miles through the territory which had been annexed to the city. It had pur-

chased a right of way for its tracks from the Baltimore and Frederick Turnpike road, upon whose roadbed its tracks were laid, and no franchise or concession had been granted it by the city.    This Court, through CHIEF JUDGE MCSHERRY, said that since the decision in 71 Md. there could be no question that the tax thus imposed "was laid and collected in consideration of the privilege or franchise granted by the city to the several street railway companies to lay their tracks and to run their cars upon the public thoroughfares of the city," and quoted from the prior case what we have italicized above. Again he said, "The history of the legislation relating to this subject would, apart altogether from the explicit language used in 71 Md., *supra*, be sufficient to demonstrate, we think, that the tax was a franchise tax exacted in exchange for the privilege accorded these several companies to lay their rails and run their cars upon city streets—streets subject to the control of the Mayor and City Conncil of Baltimore and subject to no other dominion whatever.    This is emphasized by the ordinance which reduced the rate of the tax to twelve per cent, for it provided that the several railway companies named in it (and the appellee is *not* included) should be required to pay the City Register twelve per cent of their gross receipts 'in lieu of the one-fifth as now required under their respective *grants*.'    Clearly this language indicates, if it does not expressly declare, that the tax was the equivalent for the *grant*; and consequently if there were no grant there was to be and in reality was, no tax."

The various ordinances and statutes applicable to this tax, including the Acts of 1882 and 1894, were relied on, and were urged upon the Court with great force and ability by the counsel who then represented the city, but it declined to adopt the position they contended for.    It was said, "It would do violence to the words employed in the Act of 1894, ch. 550, relating to this subject, and would ignore the distinctive character of the tax itself, if the term *street railway* were stretched so far from its natural and primary meaning as to force it to include railways, that though operated like street railways,

are in fact not built upon and do not occupy streets at all." In answer to the claim of the city, that as the Annexation Act had brought part of the tracks of the company within the new limits, therefore it became liable to pay the tax, it was said, "But the obvious answer, it seems to us, is that appellee's road was not constructed upon a street of the city; is not now located on such a street; but was built upon and still occupies its own purchased right of way over which the city has not now and never has had control; and as to the occupancy of which the city could not confer and never undertook to confer on the appellee any right or privilege whatever."

We have thus quoted at length from that case, because in our opinion it is just as applicable to the fourteen miles of tracks constructed upon the rights of way of the appellee, as it was to the facts then before the Court. There can be no real distinction between the two cases, in so far as those fourteen miles are concerned. Both were in the annex, the tracks of both were on their respective rights of way, and the ordinances and statutes relied on by the city *now* were relied on by it *then*. The first prayer of the plaintiff was therefore properly rejected, as it asked the Court to rule that it was entitled to recover the tax derived from passenger traffic upon *all* the lines of the defendant, within the present city limits, which including the fourteen miles constructed on the defendant's private rights of way.

2. This brings us to the consideration of the appellant's second prayer, which involves the lines of the defendant operated upon *public streets*, within the present city limits—including, as shown above, two miles constructed under private grants upon what subsequently became public streets of Baltimore County and six miles on public streets, constructed under grants from the Legislature and the County Commissioners of Baltimore County, before annexation. It is clear that such facts were not involved in the Park Tax case and that much which was there said can have no application to this prayer. The company then before the Court is thus spoken of in the statement of the Judge who decided it below, and

said by JUDGE MCSHERRY to clearly state the question in-
volved: "No street franchise or concession of any kind what-
ever has been conferred upon it by the city. Its tracks are
not laid upon, nor does it use, nor has it received any municipal
privilege upon any city street or streets acquired by the city by
grant, dedication or condemnation, or in any other way, and
maintained at public expense." Manifestly, therefore, that
company, which only used its own right of way, was differ-
ently situated from such companies as were using *streets of the
city*—although they only became such streets after the tracks
were laid. The ordinance granting the Central Railway Com-
pany rights in the city, which is agreed is typical of the pro-
visions of the other ordinances, does not, in terms, limit the
tax to receipts from traffic on tracks on city streets, but is
broad enough to include a tax on *all* receipts from passengers
*within the city limits.* In 84 Md., however, we gave the lan-
guage used what we deemed its real meaning to be, and held
that it was not intended to include receipts from traffic on the
private rights of way of the company; but now the appellee
asks that it be further limited, so as to only include the re-
ceipts from streets over which the franchises were originally
granted by the city. If that is what was meant in 84 Md., it
must be the end of the city's contention. But although there
are expressions in that opinion from which it may be con-
tended that such was the effect of the decision, is that what
was actually decided? It certainly was not necessary to so
decide, for the gist of the decision was, not that the language
of the ordinances and statutes was not broad enough to in-
clude all streets of the city, but that that railway was not a
*street* railway, within the meaning of them, because it was *not
on a street*, but on a private way of the company, which was
not under the control of the city. It was not intended to
hold that because the city did not originally grant the fran-
chise, the Legislature had not empowered it to impose a fran-
chise tax for the use of what are now *its streets*, although orig-
inally they belonged to the county. There are many cases
in this State, as well as elsewhere, in which the right to im-

pose a franchise tax has been sustained, although when the franchise was granted it was not imposed, or the right to do so specially reserved.   The city of Baltimore has no power to grant a franchise to use its streets, unless such power has been conferred on it by the Legislature, and the Legislature could grant a railway company the franchise to use the streets of the city without its consent.   If therefore the Legislature did directly, or through Baltimore County, grant a franchise to a company to lay its tracks upon the public streets of the county, and then subsequently authorized the extension of the city limits so as to include such streets, it could undoubtedly authorize the city to impose a franchise tax for the privilege of *using those streets*, although the grant was originally obtained from the Legislature, or the county, or both, unless there was something in the original grant which would prevent it.

In referring to the contention that an Act of Assembly, passed in 1824, which authorized turnpike companies to cede to the city such parts of their roads as were within the corporate limits, did not apply to the annex, this Court in *Balto.* v. *Turnpike Co.*, 80 Md. 543 said: "We cannot agree with the counsel for the appellant that the Legislature could not have foreseen that in sixty or seventy years the limits of the city would be extended two miles at least beyond the old city limits.   We see no good reason for imputing such a want of foresight to the General Assembly," and it was held that the Act of 1824 was applicable to turnpikes within the new limits.   If that be so in reference to an Act passed in 1824, there was much more reason for believing that the limits would be extended, when the ordinances and statutes (prior to 1888) were passed.   And we do not understand it to be denied that the city can impose the tax on the receipts from a railway in the Annex, if it grants a franchise to lay the tracks on streets thus situated.   The tax is not imposed on the receipts from each particular street separately, but on the gross receipts from all streets within the city limits, which the company uses.   Originally each company was required to

pay the tax on all its gross receipts from its lines within the city limits, and now the appellee, as the successor of all those companies, is still required to pay the tax, although reduced to nine per centum, on the gross receipts from all its lines within the city limits—*the present city limits*—excepting, as construed in 84 Md., upon receipts from such parts of its lines as are not on streets of the city, but are on its own private rights of way. The concluding part of the opinion in 84 Md. strongly indicates that view. It says: "The road does not answer the description of the class of railways heretofore subjected to the tax; and *this is so because* it never was and is not now located on a *street* of the city."

There can be no more reason for imposing the tax on receipts earned from lines on streets within the former limits of the city, than from those within the annexed territory—provided the latter are *streets* of the city. In both instances the railway company is enjoying the benefits of franchises which give it the right to use, *in a special manner*, the city streets. Its present enjoyment of those privileges is just the same, and the burden on the *city streets* is just as great, whether the franchises were originally granted by the city, or by the county. As we have said, the language of the ordinances and statutes is undoubtedly broad enough to include *all* gross receipts on *all* the lines within the city limits; and the Act of 1894, in speaking "of the gross receipts from all street railway lines within *the present* city limits," strongly indicates that the intention of the Legislature was to require payment on all such lines and that the General Assembly of 1894 so construed previous laws. Therefore when the railway company seeks what is in the nature of an exemption, or limitation if that term be preferred, there must be some more valid reason for it than the mere fact that the city did not originally make the grant, although the company uses its streets, just as it does those over which it did grant the franchises. In the Park Tax case, inasmuch as the city did not own or control the turnpike road, it could have had no ground for imposing a franchise tax, unless it had granted and the company had accepted from it

a franchise, "and consequently if there were no grant there was to be and in reality was, no tax" on that road.

It will be well to bear in mind that a franchise to use a street, or other highway, for a street railway must emanate from the sovereign power of the State. It may be granted directly by the State, or by a municipal corporation, if authorized by the State, and it may be by the State without the consent of the municipal corporation, in the absence of some constitutional prohibition, and if it were so done, there certainly could be no objection to a municipality imposing a franchise tax, if authorized by its charter to do so. The mere fact that the grant of the franchise was directly from the State would not prevent the tax from being imposed. The *real* consideration for the tax is the *use* of the streets, and not merely the right to use them which may never be exercised. The gross receipts are the result of the actual use of them, and in no wise dependent upon the question whether the city or the county was the authorized agent of the State to grant the franchise.

The opinion in 84 Md. shows clearly that the basis of that decision was the fact that the company was *not* using a *street* of the city. It speaks of a tax imposed on a railway "located and operated upon a public *street* of the city;" a tax exacted and exchanged for the privilege accorded "to lay their rails and *run their cars upon the city streets;*" of the fact that subsequent legislation "meant *streets* and not private rights of way;" that the Act of 1894 did not "include railways, that though operated like street railways, are in fact *not built upon and do not occupy streets at all;*" and other quotations, which we have made above, show that the controlling fact was that the railway was not occupying a *street* of the city—was not a *street* railway within the meaning of the laws and ordinances imposing the tax. We are therefore of the opinion that the Park Tax case does not control this branch of this case, and that the appellee is liable for the tax on receipts derived from its lines on the *public streets of the city*, including those in the Annex.

The agreed statement does not show how "the public streets" became streets of the city, although we understood it to be conceded at the argument that they are, but we do not mean to preclude the appellee by what we have said, if there be any which are not in fact streets of the city. Nor do we deem it necessary to discuss separately the lines formerly owned by the Baltimore City Passenger Railway Company, as they are included in the twenty-two miles of tracks, and whether liable to the tax must be determined by the fact whether they still occupy private rights of way, not owned or controlled by the city, or are on the streets of the city.

We do not regard the Act of 1906, ch. 566, as in any wise disposing of the questions before us. That Act is limited to roads as to which the railway company "is not legally liable to the payment of the park tax," and does not undertake to determine which are so liable. Nor do we regard what is spoken of as the acquiescence of the city authorities in the decision in 84 Md. as in anywise conclusive. Where the conditions are similar to those in that case, we have held above that the tax cannot be imposed, but where they are not, that case does not control, and the mere failure on the part of the city to assert its right to the tax on such lines as are liable for it cannot bar a recovery. We need only add that if our conclusion works a hardship upon the appellee, as was suggested it would, or imposes upon it such a burden as may injuriously affect the public using its cars, the Legislature can afford the relief—or perhaps the city, which ought not to oppress a great public enterprise, can do so, but we must construe the law as we find it.

It follows that the prayer of the defendant, quoted above, should not have been granted. If the second prayer of the plaintiff was intended to be limited to the public streets of the city, it presented a principle of law which is correct.

*Judgment reversed and new trial awarded, the appellee to pay the costs, above and below.*