MAYOR, ETC., OF BALTIMORE

*vs.*

SAMUEL F. NIRDLINGER ET AL.

———

SAMUEL F. NIRDLINGER ET AL.

*vs.*

MAYOR, ETC., OF BALTIMORE.

*"Minor privileges"; right of revocation. Police powers: nui-*
*sances; no presumptive rights. Streets in Baltimore*
*City: rights of city over.*

The provisions of the Charter of Baltimore City and amend-
ments thereto, giving to the Board of Estimates certain super-
visory powers over "minor privileges" in public highways are
prospective in their operation and were not intended to have
a retroactive effect.                              p. 607

The Board of Estimates had no authority to pass the order
of November 21, 1916, by which it undertook to revoke all
minor privileges in all the public highways and to order the
removal of all obstructions that were enumerated in the order,
without regard to when the privileges were granted.    p. 607

By long custom, contemporaneous construction, the apparent
concurrence of the Court of Appeals and Legislative recogni-
tion, it is shown and may be assumed that the City of Balti-
more had the authority even prior to the adoption of the new
City Charter to grant authority for the erection of such obstruc-
tions in the streets as awnings, areaways, vaults, steps, bow-win-
dows, poles, coal holes, porches and porticos, etc., although to a
certain extent all such obstructions tend to encroach upon the
public highways.                                   p. 612

When such privileges were granted and paid for, or were
granted at a time when no money value to the City was taken
into consideration, but were issued when deemed by the City

authorities to be proper or desirable, the successors to such authorities ought not to repudiate such action, if to do so would result in great injury or gross injustice to those who had acted in good faith, under the grant, permission or consent of those formerly in power, unless there is no other course to pursue.

pp. 609-610

The charter has not authorized, and it is not to be assumed that the Legislature intended to grant to, the Board the power of such wholesale destruction of rights that may exist in owners and occupants of property in Baltimore.                    p. 607

The very terms of the charter, under which the Board claimed such power show that they were not intended to have a retroactive effect.                    p. 608

Even in the case of permits for "Minor Privileges" issued under the "New Charter" provisions, by the Board of Estimates, when such were issued, without any reserved right of revocation, such permits can be revoked only in the exercise of the police power, and not merely as a means of increasing revenues by revoking the privilege in order to reissue them on the payment of a higher license.                    p. 621

The Board of Estimates has no power to impose charges for such privileges as were granted or obtained before 1900; and in the absence of evidence to the contrary, it will be presumed that all such privileges were granted under proper permits.                    pp. 619-621

When necessary, in the exercise of the City's police power, the obstructions occasioned by such privileges may be removed if done by the proper authorities.                    pp. 621-622

Minor privileges granted by the Board subject to revocation are revocable, unless such action be so arbitrary and inequitable as would justify the interposition of a Court of Equity, or it be shown to be for some reason illegal to revoke them. When a privilege was obtained on the condition that it should be revocable at the pleasure of the Board, the burden would be on the holder of the privilege to show that the action of the Board was arbitrary and inequitable or illegal.                    p. 622

When permits for such "Minor Privileges" were issued without reserving the right of revocation, the mere maintenance of

such obstructions as were allowed, can not be considered a nuisance, notwithstanding the attempt of the Board of Estimates to revoke such permits.                    p. 621

There can be no prescriptive right permanently to use the public streets for private purposes.                    p. 619

The Mayor and City Council of Baltimore City have control over the streets and ample authority for their protection.
p. 610

The adoption of a City Code of ordinances can not validate a void ordinance.            .                    p. 611

Legislation authorizing a municipality to charge for "minor privileges" to some extent recognizes the necessity for them, and it is not to be presumed the Legislature will grant the powers exclusively as a revenue measure, when the use of such privileges would materially obstruct the public.                    p. 609

*Decided December 13th, 1917.*

Ten appeals in one record from Circuit Court No. 2 of Baltimore City.    (DUFFY, J.)

The facts are stated in the opinion of the Court.

The ten causes were argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*S. S. Field, City Solicitor,* for the Mayor and City Council of Baltimore.

*Randolph Barton, Jr., Charles McHenry Howard, Martin Lehmayer* and *Joseph C. France,* for the property owners.

BOYD, C. J., delivered the opinion of the Court.
Seven bills in equity were filed in Circuit Court No. 2 of Baltimore City, whereby it was sought to enjoin the Mayor and City Council of Baltimore, the Board of Estimates, the Inspector of Buildings and the Chief of the Bureau of Minor

Privileges of said city from in any manner interferring with the "minor privileges" connected with or related to the buildings of the respective parties set out in the bills. The first, in the order in which they appear on the docket, was filed by Samuel F. Nirdlinger and others, which will be hereinafter referred to as the Academy of Music; the second, by the Hotel Rennert Company; the third, by Stewart & Company; the fourth, by Isaac Benesch & Sons; the fifth, by J. Henry Miller; the sixth, by R. Nelson Stevens *et al.*, and the seventh by Mary A. Fifer. Appeals from the decrees passed were taken by the City in the Academy of Music, Hotel Rennert, Stewart & Co. and the Fifer cases, and cross-appeals were taken by the respective plaintiffs, except in the Fifer case, and appeals were also taken by the plaintiffs in the Miller and Stevens cases. Although the cases present some different phases of the main questions involved, they were argued together and will be considered in this opinion.

On or about January 5th, 1917, the Board of Estimates caused to be inserted in the newspapers of Baltimore an advertisement of what is called "New Corrected Schedule of Charges for Minor Privileges. Effective Jan. 1st, 1917." The schedule embraces a great many subjects, including areas and area-ways, awnings, balcones, coal holes and chutes, lamps, marquees, signs, vaults, columns, piers and show-windows. Notices were sent out to the various parties as follows:

"See Revised Charter, Sections 8 and 37.
BUREAU OF MINOR PRIVILEGES.
Room 22, City Hall.

Name......................................., 19.....
Address. . . ...............................................
Minor Privileges. . . ...............................

You are hereby notified that, under the order of the Board of Estimates (copy of which you will find below), the above-mentioned use by you of the public highway is illegal, and you are required to discontinue such use and remove all obstructions or projec-

tions into the highway connected therewith without further notice. Should you desire to apply for a permit to continue such use, file your application with the Inspector of Buildings at once, and the same will be presented to the Board of Estimates for their action. Blanks and information for such application will be furnished by the undersigned upon request.

                              H. W. JOHENNING, *Chief.*"

"ORDER OF BOARD OF ESTIMATES.

"In order to preserve the public highways of Baltimore City for the use of the traveling public, the primary purpose for which they are constructed and maintained, and in order to obtain from all persons enjoying minor privileges in any portion of the public highway, for private purposes, relatively equal annual payments for the privilege,

"It is Ordered by the Board of Estimates this 21st day of November, 1916, that all minor privileges in all the public highways of Baltimore City are hereby revoked. And all persons having * * * (naming different kinds of privileges) or other obstructions into, under or over any portion of the public highway, are hereby ordered to remove every such obstruction from the public highway within thirty days from the first publication of this Order in the newspaper, unless within that time the party maintaining the projection or obstruction shall apply to the Board of Estimates for a permit therefor, and the Board shall grant such permit. Application blanks for such permits may be obtained from the Bureau of Minor Privileges, Room 22, City Hall.

" 'Copy,' in duplicate, delivered to the office of the Marshal of Police, March 12, 1917."

"POLICEMEN'S REPORT OF SERVICE.

"Copy of the above Notice and Order was served on the party therein mentioned...................,
19..... Officer................"

1.   It will be well to state our views on the main ques-
tions and then apply our conclusions to the several cases be-
fore us.   The Board based its authority for such action on
the Charter, as passed by the Act of 1898, Ch. 123, with
amendments thereto—particularly sections 8 and 37, which
are specifically refrered to.   Section 7 declares that the title
of the Mayor and City Council in its highways, etc., shall be
inalienable.   Section 8 originally provided that *the Mayor
and City Council* could grant for a limited time, and subject
to the limitations and conditions in Article 4 of Code of P.
L. L., specific franchises or rights in or relating to any of
the public property or places mentioned in section 7; provided
that such grant be in compliance with the requirements of
the article and that its terms and conditions shall have first
been authorized and set forth in an ordinance duly passed.
It provided that notwithstanding any such grant the Mayor
and City Council "shall at all times have and retain the
power and right to reasonably regulate in the public interest
the exercise of the franchise or right so granted."   By Chap-
ter 616 of Acts of 1904, that section was amended by adding
that no franchise shall be granted for the erection on any
of the streets, lanes or alleys of the city, "of any awning
poles, posts, hitching-posts, barber poles, railings, open areas,
stepping stones, sign-posts, horse troughs, clocks, stands of
any character or cellar doors or coal holes, unless the same
be flush with the pavement."   Then by Chapter 152 of Acts
of 1906, it was further amended by striking out of the pro-
hibition, added by the Act of 1904, the words "open areas"
and adding "nor shall any franchise be granted for an open
area unless the same is used as a means of entrance to build-
ings used primarily for purposes of residence, and only in
such case when the same does not extend more than three and
one-half feet from the building line."   Section 9 prescribes
terms and conditions of grants and franchises, amongst others
prohibiting franchises or rights for a longer period than
twenty-five years, but provided for renewals, etc.   Section 10
provides for publication of proposed grants and section 11

that the *Mayor and City Council* "shall not part with, but shall expressly reserve the right and duty at all times to exercise in the interest of the public full municipal superintendence, regulation and control in respect to all matters connected with said grant, and not inconsistent with the terms thereof." Section 37 as originally adopted provided that before any grant should be made by the *Mayor and City Council* of a franchise or right to use any street, etc., the proposed specific grant should be embodied in the form of an ordinance, with all the terms and conditions required by the provisions of that article, and such others as might be right and proper; that after the first reading of the ordinance it should be referred to the Board of Estimates, the duty of which was to make diligent inquiry as to the money value of the franchise or right and the adequacy of the proposed compensation to be paid therefor to the city, etc. By Chapter 109 of Acts of 1900, that section was amended by adding a provision that the right to use the streets "for bow or bay windows, hitching posts, area-ways, steps, planting of trees, storm doors, drains and drain pipes, stands or other such temporary or similar uses," may be granted by the Board of Estimates for such amount and on such terms and conditions as the Board may consider right and proper. Before the Board can grant any such right an application is required to be filed in which must be stated "what the applicant is willing to pay for the same," and copies of such application are required to be served on the adjoining property owners by the applicant before filing the application with the Board. It provided that no ordinance or advertisement should be necessary in the cases named in the proviso of that section. Then by the Act of 1906, Chap. 357, that section was further amended, as it is now in the revised charter, so as to provide for the right of the Board to grant "the right to use the streets, avenues, alleys or public property by any person or body corporate for steps, porticoes, bay windows, bow windows, show windows, signs, columns, piers or other projections or structural ornaments of any character, except so

far as the same may be prohibited by law, and covered vaults, covered area-ways, drains, drain pipes, or any other private purpose not prohibited by law, and not being a franchise or right requiring a formal grant by ordinance under the terms of this section."

We have thus referred at length to the provisions of the charter having relation to the powers of the Board of Estimates, in regard to these privileges, and after giving them our most careful consideration we are forced to the conclusion that the Board had no authority to pass an order by which it undertook to revoke *all* minor privileges in *all* the public highways and to order *all* persons having such things as are enumerated in the order to remove them, regardless of when they were granted. The charter has not authorized and we can not assume that the Legislature intended to grant that Board the power of such wholesale destruction of rights that may exist in owners and occupants of property in Baltimore. It matters not under what authority they might claim the right to such privileges—whether by ordinance or otherwise—or whether they have already paid for the privilege or when granted, those claiming them were thus attempted to be deprived of them without even a hearing or opportunity to present their claim of the right to them. If one has a privilege through an ordinance duly passed the order was equivalent to a repeal of it if it could be effective. Those who claim to have irrevocable franchises or rights which for some reason can not be affected were required to surrender such claim in order to get a hearing before the Board. Much of what was said as to the powers of that Board in *Baltimore* v. *Hampton Court*, 126 Md. 341, is applicable here.

2. The very terms of the several sections of the charter referred to show that they were not intended to have a retroactive effect. As was said in *United Railways* v. *Hayes*, 92 Md. 490, in speaking of the provisions in the new charter as to railway companies on page 497: "But these provisions evidently were intended to apply to the future. This we

think is made manifest in view of the second section which provides that the charter shall not affect or impair any right, vested, acquired or existing." The language and provisions of the charter applicable to these privileges speak too strongly for themselves to require us to cite authorities to show the position this Court and others have taken in reference to retroactive statutes, and we find nothing in the charter to indicate that it was intended to be retroactive in regard to such privileges as these, or that it was intended to confer such sweeping powers on the Board of Estimates in reference to them as the order of November 21st, 1916, indicates it supposed it had.

3.   It is apparently difficult to ascertain the actual facts in reference to some of these privileges claimed to have been granted or begun some years ago.   There seem to be no records which can be said to be at all complete prior to 1904, and there is no index to the papers formerly under the control of the Inspector of Buildings prior to 1900.   They are kept in crates in such way as to make them difficult to find, if indeed records of permits granted by that officer or his predecessor were kept or made.   There is in some instances evidence of payments by some of these parties, as shown by the records in the Comptroller's office, when there is apparently not to be found among the records of the officials who issued them evidence of the issuing of permits by those authorized to issue them.   It is remarkable that in a city as large as Baltimore there should have been as much apparent carelessness about such things as are now called "minor privileges," until recent years.   There is, however, enough in the record to show that if the theory of the present city authorities be correct, and it be universally put into effect many of the property owners in the city might sustain great injury. That a very large number of houses, if not the great majority of them, have steps, cornices or other projections over parts of the sidewalk, many of them on important streets and avenues, is apparent to any one passing over the streets of the city, and the officials must recognize the fact that it would

be impossible to now remove them, certainly in very many cases, without causing much more injury to the owners than benefit to the public. While ignorance of the law may afford no excuse, it does not have a tendency to make people more law abiding to have those in authority countenance, if not actually participate in, encroachments upon the public highways under their charge, year after year (as some of the officials in former years must have done) and then have their successors at a later period treat them as trespassers and as guilty of erecting or maintaining nuisances.

When a city grows as Baltimore has there may be more necessity for preventing abutters and others from in any way encroaching upon the highways except in so far as may be necessary temporarily for building or like purposes, and it may be very desirable to avoid some of the encroachments in the future, but in some of the cases before us, it is practically admitted that the Board did not expect the parties to remove the alleged obstructions, but did expect them to pay, and in some instances repay, for them and continue them as they are, subject to such regulations and restrictions as may be imposed on them in the grants. It can make no difference to the public in the use of a street whether a vault, area-way, pole, sign, coal-hole, marquee or show window is paid for or is free, for it is just as much an obstruction in the one case as in the other. Indeed, it might well be contended that legislation authorizing a municipality to charge for such privileges, to some extent recognizes the necessity for them, as it is not to be presumed that the Legislature would grant the power *exclusively* as a revenue measure, and when they do materially obstruct the public they ought not to be granted, unless there is some real necessity for them. But when they are granted and paid for or were granted at a time when no money value to the city for them was taken into consideration but the authorities deemed it proper, possibly desirable for the city to allow them and the parties were induced to construct their buildings accordingly, instead of keeping back of the building line so they could keep them on their own

ground, or to erect costly improvements, the successors in
office of those who granted them ought not to be required in
the discharge of their duties as they understand them to repu-
diate the action, or even *inaction* with knowledge of what
was being done of their predecessors in office if that must
result in great injury or gross injustice to those who acted in
good faith upon the grant, permission or consent of those in
power at the time unless there is no other proper course for
them to pursue.

4.   We do not understand the City of Baltimore to have
been as helpless and impotent prior to 1898, when the new
Charter was granted, as the contention of the appellees would
seem to indicate.  From the reported cases decided by us and
our predecessors we know that the City of Baltimore had as its
legal advisers for years before the Charter of 1898, as it has
had since some of the leading members of the Bar, and es-
pecially when we see by the city Codes in force at least as
far back as is necessary to go in considering any of these
cases that ordinances bearing on these questions or most of
them were in effect, it would be difficult to understand how
such attorneys could have permitted the city to continue in
such a helpless condition or the rights of its citizens making
costly improvements to be so jeopardized if the position con-
tended for by the city be correct.

It is clear, however, that the corporation had control over
the streets of the city.  As said in *Textor* v. *B. & O. R. R.
Co.,* 59 Md. 63: "The streets are under the exclusive con-
trol of the city as avenues of travel," and JUDGE ALVEY said
in *Sinclair* v. *Baltimore,* 59 Md. 592, that "By the Charter
of the city 'all the streets, lanes or alleys opened in the man-
ner directed, shall be public highways and be subject to the
laws, regulations and ordinances applicable to public streets,
lanes or alleys, or parts thereof in said city,' and his opinion
speaks of the city as having "exclusive power over the streets."
In *Garrett* v. *Janes,* 65 Md., on page 265, it was said that
the City Code of 1879 "has been recognized as the repository
of the ordinances, valid at its adoption, in the subsequent

city legislation, and has been cited by parties and relied on
by this Court in numerous cases as of undoubted authority."
It will, of course, be conceded that the adoption of a Code of
ordinances not necessarily validate an invalid ordinance, but
that and later codes embodying such ordinances were used
so long that surely someone would have tested the validity of
such important ordinances as some of those on this subject,
if there had been any doubt about their validity by those at
the Bar during the many years some of the ordinances were
treated in effect prior to 1898, and our predecessors would
not have been permitted to proceed on the assumption, never
before questioned so far as the records of this Court show,
that they were valid. In *Preston* v. *Likes,* 103 Md. 191, this
Court and the counsel engaged in it recognized an ordinance
passed in 1895, regulating the erection of awnings. The
decision of the case depended upon whether that ordinance
(Ordinance of the Mayor and City Council of Balti-
more, No. 116, approved July 18th, 1895) or section
37 of the Charter, as amended by the Act of 1900,
was controlling. According to the city's contention there
was no legislative power given to it except by the Act of
1833, Chap. 180, which was applicable to Mt. Vernon Place,
and the Act of 1854, Chap. 9, which conferred on the city
the power of regulating steps, porticoes, bulk windows or other
architectural ornaments. A statute authorizing a municipal-
ity to pass ordinances regulating the limits within which
such things can be erected would seem to imply that they
could have been lawfully erected before that statute was
passed, as otherwise there would be no occasion for authoriz-
ing their regulation. But section 29 of Article 4 of Local
Code of 1888 (sec. 33 of 1860) provided that the "Mayor
and City Council shall have power to pass all ordiances nec-
essary to give effect and operation to all the powers vested in
the corporation," and section 721 of Article 4 of Local Code
of 1888 (sec. 32 of 1860) provided that: "The Mayor and
City Council may pass ordinances for * * * protecting the
public and city property, rights and privileges, from waste

*or encroachment,* and for promoting the great interest and insuring the good government of the city," and by section 378 of Article 4, Code of 1888 (sec. 797 of 1860), the Mayor and City Council had power to pass ordinances to prevent and remove nuisances.

These and other provisions which might be referred to gave the Mayor and City Council control over the streets and ample authority to pass ordinances for their protection. They passed many ordinances in regard to some of the alleged encroachments referred to. We are then of opinion that not only by reason of the contemporaneous construction, which we may assume from what we have said, was placed on them by the members of the Bar, and apparently concurred in by this Court, at least so far as it has given expression to its views, and from the necessity and the general custom in regard to many of the privileges—not now referring to the question whether the city is not equitably, if not legally, estopped by its action and inaction—but by the statutes we have referred to there can be no serious doubt that the city had the power to pass ordinances and grant such permits as are here in question. Being of that opinion it is perhaps unnecessary to do more than at once apply the legal conclusions we have reached to the facts in the several cases, but it may be well to first refer to authorities on some of the more important privileges.

5. *Vaults and Areas.* In 3 *Dillon Mun. Cor.* (5th Ed.), sec. 1178, etc., that learned author discusses the subject of vaults under sidewalks, areas, etc. In Section 1178 it is said: "In many cities lot proprietors upon streets are permitted *or not forbidden* (italics ours) to make openings in the sidewalks, in order to obtain an entrance into the basement or cellar. It is also the usage that owners of buildings may make openings *under* the sidewalk or street to obtain additional cellar room." He says, however, that, regardless of whether the fee is in the municipality or in the abutting owner, such vaults are subject to legislative and municipal regulation. In section 1179 he quotes at length from *Nelson*

v. *Godfrey,* 12 Ill. 22. After declining to admit that the owner by reason of his ownership of the adjoining property could claim the absolute right to take up the sidewalk and extend his coal cellar under it, the Court in that case said: "But as such a privilege is a great convenience in a city, and may with proper care be exercised with little or no inconvenience to the public, we think that the authority to make such cellars may be implied, in the absence of any action of the corporate authorities to the contrary, they having been aware of the progress of the work." That was followed in *Gridley* v. *Bloomington,* 68 Ill. 47, and in *Gregsten* v. *Chicago,* 145 Ill. 451, it was held that (quoting from the syllabus for convenience): "It is the general doctrine that municipalities, under the power of exclusive control of their streets, may allow any use of them consistent with the public objects for which they may be held." Again, it is said: "A city under special legislative authority, *as well as its general powers* (italics ours), may grant permits for and regulate the building of vaults under the streets, alleys and sidewalks, and require such compensation for the privilege as it may deem reasonable and just, when such permits relate solely to such use of the alleys, etc., as is in nowise inconsistent with their use by the public, and such permit when accepted and acted on by the holder by making costly improvements required will constitute a contract between the city and such holder irrevocable at the mere will of the city." Again, it was said in that case: "The approval by the City Council of a permit of the Board of Public Works, to one to construct a vault under an alley may be inferred by the acts of the holder of such permit, in excavating the earth and making a costly vault, and the use and occupation of the same for about twenty years without objection on the part of the city."

In section 1180 of 3 *Dillon* the author says that: "The giving of *consent* to the maintenance of a *vault* beneath a sidewalk is said to be an executive act, which, from its nature, does not require an ordinance or resolution, as in the case of a legislative act or a written decision as in the case

of a judicial act. *It may be given orally.*" And that: "Permission to construct a vault may be inferred from acquiescence in its maintenance for many years. The presumption of the assent of the public authorities applies not only as between the owner of the property and a third person but also as against the city, if there is no proof to overthrow it. But this presumption is not that the owner or his grantors acquired any right to the use of the street by prescription, or without the consent of the proper authorities, but that from such use it may be presumed that the proper consent was given." He cites in the note: *Chicago* v. *Robbins,* 2 Black, 418; *Robbins* v. *Chicago,* 4 Wall. 657, and a number of Illinois and New York cases.

The case of *Everett* v. *Marquette,* 53 Mich. 450, in which the opinion was delivered by CHIEF JUSTICE COOLEY, is similar in many respects to this, and we will quote at some length from it. In 1868 the owner of a block of houses obtained permission of the Common Council of Marquette Village to make openings in the sidewalks for the purpose of stairways to the basement. The stairways were constructed and used with proper railings for the protection of the public. Afterwards Marquette was incorporated as a city, and in 1878 the Common Council directed the stairways to be removed as illegal, and the openings in them to be closed. The complainant filed his bill to enjoin that action, and the Circuit Court granted a perpetual injunction.

It was contended on appeal that the village Common Council had no power to give permission for the permanent appropriation of any part of the street for private purposes, and if it had it could only be effective by a grant duly executed, etc. It was further alleged on the part of the city that the permission had been very valuable to the owner, and it was ungracious and inequitable for him to endeavor to make the appropriation perpetual which in the opinion of the City Council had become a public grievance. JUDGE COOLEY said: "But it is not necessary in this case to determine whether the permission given by the village council was in due form

for the purposes of a permanent appropriation, or even whether the council had the power to consent to such an appropriation. It is undoubted that the council had general control of the streets under the village charter; and it was a part of its duty to prevent the creation of any public nuisance within them. It is not to be assumed that consent would have been given to such a nuisance, and when by formal resolution the council assumed to give permission to complainant to make the openings and build the stairways complained of, it must have been done in the belief that no public inconvenience would follow. If the permission was effectual for no other purpose it at least rebutted any presumption which might otherwise have existed that this partial appropriation of the street was *per se* a nuisance.

"If the permission was a mere license and the subsequent action of the City Council is to be regarded as a revocation of the license, it does not follow that the plaintiff has by the revocation immediately been converted into a wrongdoer. The question will then be whether the act of the complainant in maintaining his structure constitutes a public nuisance; and while the City Council is entitled, under its supervisory control of the streets, to consider and pass upon that question for the purpose of deciding upon the institution of legal proceedings for abatement, it can not make itself the judge."

He then went on to say that such questions should be tried out in the regular courts, and concluded by saying: "The city in this case was proceeding in an act of destruction on an assumption that the structures were already condemned as illegal. This was unwarranted, and it was quite right that the action should be restrained."

It will be observed that that learned Judge in sustaining the injunction granted below relied on grounds outside of the question of consent of the municipality, or its power to consent, and based his decision on those which are very applicable to this case. Here no action has been taken by the Mayor and City Council to revoke the privileges but a board as destitute of the power to revoke those granted by others as

the city authorities contend the city was to grant them, declared all of them to be revoked.

In the case of *Babbage v. Powers,* 130 N. Y. 281, vaults were built under the pavement in front of three stores on State street, in the City of Rochester. They were covered with flagstones, one of which broke and the plaintiff was injured. The defendant purchased the properties after they were built. It did not appear that express authority had been given by the city or in its behalf either to the defendant or his grantor, but on the contrary a witness called by the plaintiff testified that he had examined the records of the two Boards, of each of which he was clerk and also a member, which during the period the vaults were erected had charge of such matters, and did not find that any written permission had been given by either of those bodies to construct the vaults and at the time the Common Council did not exercise jurisdiction over such subjects. It appeared from the testimony that State street was a business street and that such excavations were common all over the city. There was no evidence of objection on the part of the city or its officers to the construction of the vaults.

After citing a number of authorities, some of which might be referred to with profit, the Court of Appeals said: "We have been referred to no case, and have found none, criticising or condemning the doctrine of implied consent as thus laid down by the courts." And concluded by saying: "We think that both upon principle and authority consent to an act so common and necessary as the construction of a vault under the sidewalk in front of a block erected and used for business purposes must be conclusively inferred from the acquiescence of those having charge of the street for the public for so long a period as nine years." It was also held in that case that in the absence of a statute regulating the subject a written consent is not requisite, but a verbal one is sufficient.

6. *Bay Windows, Porches, Etc.* It is said in 3 *Dillon,* sec. 1182, that there is no uniform rule in the different jurisdictions as to whether *porches, bay windows, cornices and*

*other ornamental projections* encroaching on the street may be lawfully erected with the assent of the municipality, express or implied. Without discussing that at length it is sufficient to say that the case of *Garrett* v. *Janes,* 65 Md. 260, would place this State in the line of those first mentioned by that author where he says that: "In some States the decisions declare that the Legislature has power to authorize these structures within reasonable limits, and that such a use of the streets is not a perversion of the streets from their proper and legitimate uses. In these States it is also held that this power may be delegated to the municipality, which, by virtue of its control over the city streets, may make proper and reasonable regulations as to the erection of these projections; and that such structures erected under permits from the municipality are not illegal encroachments or obstructions."

It may be remarked in passing that while the language used in the Act of 1854 can not be unreasonably extended, it ought not to be too much restricted. For example, the term "bulk window" does not seem to be in very common use now, but as will be seen in the *New Standard Dictionary* there is a word "bulk" which is defined to be "A projecting part of a building; a framework in part of a shop; stall." It would be a narrow construction of the expression "bulk windows or other architectural ornaments," to say that they only meant "bay windows" or "bow windows," as they are sometimes called, and did not include "show windows." So with "porches" and "porticoes." Such structures as "marquees" are embraced in the definitions of "porticoes" and "porches" as given in the dictionaries, and we certainly would not be justified in holding that the words "porticoes" or "porches" are not sufficient to include them. In 3 *Dillon,* sec. 1186, it is said: "The right of an abutting owner to construct and maintain *awnings* extending into the street in front of his premises is dependent upon the assent or license, either express or implied, of the municipal authorities, to whom the care and control of the streets of the municipality is desig-

nated. When constructed with the consent or by the permission of the municipality, express or implied, an awning is not a nuisance, or illegal encroachment. But under statutory authority, the municipality may by ordinance regulate the erection of awnings, and may require a permit for their erection, or may forbid their erection. A permit therefor granted pursuant to legislative authority *can not confer a permanent right* to maintain the awning, but is only a *revocable license.*"

In *Etchison* v. *Frederick City,* 123 Md. 283, we sustained an ordinance passed by legislative authority providing for the removal of awning poles, etc., but JUDGE BRISCOE, in delivering the opinion referred to *Brauer* v. *Refrigerating Co.,* 99 Md. 367, where JUDGE SCHMUKER said that: "The owners of lots abutting on streets are permitted to encroach to a limited extent for the necessary transaction of their business upon this primary right of the public, provided they do not unreasonably interfere with its exercise. But it must always be borne in mind that the right of the public to employ the streets for the purposes of travel and transportation is the paramount one, and that of the abutter to occupy them for other purposes is a permissive and subordinate one."

The City of Baltimore passed many ordinances regulating various objects involved in this case, such as steps, porches, porticoes, sign posts, signs, awnings, bay windows, bow windows, vaults and areas. Most of those prior to 1898 can be found in the City Codes of 1879 or 1893, and some of them were passed as early as 1858 and from that time down to 1895. The Code of 1906 contains many ordinances on these subjects, but that was after the new Charter was adopted, although it still has some of the older ordinances with amendments. This opinion is already too long to refer more specifically to them, but they in effect were broad enough to cover all the privileges in these cases granted prior to the adoption of the new Charter, and we think there can be no doubt about the powers of the Mayor and City Council to pass them. They were at least so far binding on the city as to relieve the

owners from being trespassers or guilty of creating or maintaining nuisances. We are not now concerned about the rights of owners or occupants of adjoining properties, such as were involved in *Van Witsen* v. *Gutman,* 79 Md. 405; *Townsend, Grace & Co.* v. *Epstein,* 93 Md. 537, or *Brauer* v. *Refrigerating Co.,* 99 Md. 367. Although the city has had powers granted to it under the Act of 1898, and amendments thereto, in reference to privileges in the streets, it would by no means follow that it could deprive other property owners of their rights. Indeed the two cases last mentioned were after the Act of 1898 was passed. In *Epstein's case,* he had obtained an ordinance from the Mayor and City Council and in *Brauer's case* he had obtained the consent of the Board of Estimates. But in these cases we think under a proper construction of the Act of 1854 the city was specially authorized to grant permission for many of the things in controversy, and under its general powers and the statutes referred to had the right to give its consent to the erection of the other things.

It is conceded by the plaintiffs that they have not acquired and can not acquire by prescription the right to permanently use the streets for private purposes. Nor do they contend that the city has lost the control of the streets.

As we have already pointed out the proceedings taken by the Board were not primarily for the purpose of removing obstructions or projections from the highways. While the order of November 21st, 1916, did begin by stating: "In order to preserve the public highways of Baltimore City for the use of the traveling public," etc.; it added: "and in order to obtain from all persons enjoying minor privileges in any portion of the public highway, for private purposes, relatively equal annual payments for the privilege." Then throughout the record it is shown that they expected to realize a large sum of money—greatly in excess of any sum which had been previously received for such privileges. The advertisement of the Board explaining the reasons for the new schedule, and the evidence of the members of the Board

show very clearly that they regarded it their duty to obtain more revenue from the privileges, and it is said in the advertisement that "we find from the report recently made of the survey by the police department that fair and reasonable rates for those franchises and privileges in the public highways will materially reduce the burdens upon the general tax payers." Again, it is there said: "In order to do justice to the public, by requiring everyone to pay a reasonable rent or charge for a special use of the public highways, and in order to establish fairness and equality among the people who have special privileges in the public highways, a new schedule was recently adopted."

No one knowing the character of men constituting the present Board will question their motives, and their desire to discharge their duties faithfully is of course to be commended, but as we understand the provisions of the Charter relative to their powers and duties, we are convinced that they exceeded their powers when they attempted to revoke, without even an opportunity for a hearing, all privileges, which included those granted before the Board was in existence, as well as those granted by the Board. It was said in the advertisement spoken of that no one was obliged to pay any minor privilege charge, as he could keep on his own ground and not encroach on a public street, but that overlooked the fact, clearly established in the record, that in some cases large sums of money had been expended by reason of the grants of the privileges, previously obtained, and it is now attempted to put the owners in a position in which they must either pay what the Board says is reasonable and just, or give up the privileges and lose what they have expended. Without discussing the question at length in this opinion, as we do not deem it necessary or desirable to do so, it might well be contended that the principle of equitable estoppel would apply to at least some of these privileges. In 3 *Dillon,* sec. 1194, where many cases are cited, including *Baldwin* v. *Trimble,* 85 Md. 396, and in *Hagerstown* v. *Hagerstown*

*Railway,* 123 Md. 183, and cases there cited, the question was sufficiently considered.

It may be well to summarize our conclusions as to the more important questions, especially such as the learned Judge in the lower Court referred to in his opinion, which was made a part of the decrees. They are:

1. That where there is no evidence to the contrary the Court will presume that permits were duly obtained from the city for the erection of minor privileges mentioned in the evidence. As we have reached the conclusion that the city had power to grant such privileges before the Act of 1898, and as far back as affects any of these cases and the evidence shows they were openly and publicly enjoyed without objection, being of a character which must have been known under the decisions of the courts and other authorities, some of which are quoted from or cited above, that presumption is a proper one.

2. That the attempted revocation of the privileges by the Board was not in the exercise of the police power but primarily to obtain revenue.

3. That the provisions of the charter conferring powers on the Board were not retroactive, and the Board has no power to impose charges for privileges granted or obtained before 1900, when by amendment to the charter the right to grant minor privileges was conferred on it, whether or not they were revocable by the proper city authorities.

4. That permits issued without the power of revocation, either in the permits or in some ordinance or law then in force which can be read into them, can only be revoked in the exercise of the police power. The evidence does not show that any of the privileges before us are unduly obstructing the public in the use of the highways, and the parties are not shown to be trespassers or guilty of erecting or maintaining nuisances.

5. If it becomes necessary in the exercise of the police power to remove such obstructions or projections, nothing

said in this opinion is intended to interfere with that, if done by the proper officials.

6. Minor privileges granted by the Board subject to revocation are revocable, unless such action be so arbitrary and inequitable as would justify the interposition of a Court of Equity, or it be shown to be for some reason illegal to revoke them. When a privilege was obtained on the condition that it should be revocable at the pleasure of the Board, the burden would be on the holder of the privilege to show that the action of the Board was arbitrary and inequitable or illegal.

7. But where the parties to whom they were granted paid for such privileges as those mentioned in paragraph 6 or were by the granting of them led to incur substantial expense, which may be for the most part lost, they are entitled to a hearing, and the privileges can not be revoked unless under all the circumstances in the particular case that is shown to be just and equitable, or it be done in the exercise of the police power.

It is true that the Board in its notices tendered the parties an opportunity to have the privileges renewed, but, without an opportunity to be heard, it first revoked them and would only re-grant them on their own terms if re-granted at all. It is no answer to say that the Board would be just and deal fairly with them, and we have not overlooked the fact that it appears in the record that it made some modification of the original schedule adopted in January, and that the members of the Board said that they did not regard the amounts fixed therein as conclusive, but would be governed by what they thought was right when the parties applied. That shows the importance of giving the parties an opportunity to be heard in advance of the revocation; as they might thereby induce the Board to further modify the charges, and justice would seem to require that they be given such opportunity before they are placed in the undesirable position of being trespassers and maintaining nuisances, as is contended by the city they are. It may be conceded that this Board would on application for renewals deal justly and fairly with

applicants, but it is possible that others might not, and at
any rate that is not the test adopted by the courts. *Johns
Hopkins Club* v. *Baltimore,* 130 Md. 282. But regardless
of that it was never intended by the Legislature to grant the
Board the power to revoke such privileges without any op-
portunity for the parties to be heard. The principles an-
nounced in *Baltimore* v. *Radecke,* 49 Md. 217, and in some
of the authorities cited above, are instructive. If the Board
is authorized to thus summarily revoke such privileges, even
though they be treated as mere licenses, and then require as
a condition of entertaining application for new grants that
the applicants, waive all rights they have, gross injustice may
be done to the applicants, if not great injury to the city. No
one would expend any considerable sum of money for the
ornamentation of his property and benefit of his business,
and pay for the privilege, if he supposed that it could be
taken from him the next day, month or year, unless he paid
such additional sum as that or some other Board exacted of
him.

In order to avoid misunderstanding, it may be well to add
here that if it be found necessary, in the exercise of the
police power, in order to protect the public in the use of the
streets, or meet some emergency, to at once revoke a permit
and remove an obstruction or projection, what we have said
would not in all cases apply. Whether or not such action
should be then taken by this Board or by other officials we
need not now determine.

Without further discussing the subject we are of opinion
that the lower Court should have granted the injunctions in
each of these cases, but they should be issued without preju-
dice to the Board (in such cases as we have said above it has
the right to take such action) to notify the parties to appear
before it and show cause why the privilege or privileges
should not be revoked or additional charges made for it or
them, and without prejudice to the city officials taking action
in the exercise of the police power. Of course, what we have
said in this opinion as to the rights of the holders of such

privileges must be recognized.  The *Stevens case* is the only
one we have had any question about, but while there was an
application for a permit after the schedule was published,
which was approved by the Board, the applicants did not
accept it and have not made use of it.  The application was
apparently made under a misapprehension—the party apply-
ing supposing it was necessary for them to do so.

It follows from what we have said that the decrees in Nos.
56 and 57 (the *Academy of Music case*), Nos. 58 and 59
(*Hotel Rennert case*), Nos. 60 and 61 (*Stewart & Co. case*),
and Nos. 62 and 63 (*Isaac Benesch & Sons case*) must be
reversed in part and affirmed in part, and those in No. 64
(*J. Henry Miller case*) and No. 65 (*Stevens Brothers case*)
must be reversed, and the one in No. 66 (*Fifer case*) must
be affirmed.  As apparently both sides are in part responsi-
ble for the record in Nos. 56 and 57 (in which is the testi-
mony in all the cases by agreement) being much larger than
necessary, we will not impose all of the costs on the city, but
will direct that the Mayor and City Council pay two-thirds
and the plaintiffs in the other cases, except Mary A. Fifer,
pay the other third of the casts.

> *Decree in Nos. 56 and 57 affirmed in part and
> reversed in part, and cause remanded in
> order that a decree may be passed in ac-
> cordance with this opinion—the Mayor and
> City Council of Baltimore to pay two-thirds
> and the plaintiffs in this case and the
> Hotel Rennert Company, Stewart & Co.,
> Isaac Benesch & Sons, and the Benesch
> Realty Company, J. Henry Miller, Stev-
> ens Brothers, and the Trustees under the
> will of William A. Dunnington (they
> being other plaintiffs below) pay the other
> third of the costs.*