MAYOR & CITY COUNCIL OF BALTIMORE *v.* CANTON CO. OF BALTIMORE CITY

[No. 151, October Term, 1945.]

*Decided June 14, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Paul R. Kach, Assistant City Solicitor of Baltimore
City,* with whom was *Simon E. Soberoff, City Solicitor of
Baltimore City,* on the brief, for the appellant.

*J. Crossan Cooper, Jr.,* and *Hunter H. Moss,* with whom
were *Venable, Baetjer & Howard* on the brief, for the
appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by the plaintiff from a judgment for
the defendant (appellee) for costs, in a suit for certain
"minor privilege charges."

Defendant owns two piers, each built into the navigable
waters of the Patapsco in front of land which, since
1918 or earlier, has been within the Baltimore City
limits. In 1922 and 1930, respectively, defendant made
application for consent of the Harbor Engineer to exten-
sions of these piers within the pierhead line. Permits
for the extensions were granted by the Board of Esti-
mates, "subject to inspection and minor privilege
charges." The applications were in forms acceptable
to the city; permits would not have been granted unless

these forms had been used. The extensions were made, and the defendant has regularly paid state and city property taxes on them.

Before 1917 plaintiff did not make minor privilege charges for improvements made into the Patapsco, but it has claimed such charges from the owners of all such improvements made since 1916. The rate of the annual charge was fixed at ½ cent per square foot of surface area of the improvements, without regard to location, cost, use or value of the structures, and was not based upon the cost of governmental regulation. The annual charges claimed from defendant are $105.88 and $1.10 respectively, none of which have ever been paid. They amount to $2,064.66 (for the years 1923 to 1941, inclusive, and part of 1922) and $12.10 (for 1931 to 1941, inclusive). Suit was brought for these amounts on December 5, 1941. The case was tried without a jury. A clear comprehensive opinion was filed, and judgment was entered for the defendant for costs. It was stated at the argument that some owners have regularly paid the charges made, others (like defendant) have never paid them, and the claims for uncollected charges now amount to some $375,000.

Plaintiff claims the right to make charges for such improvements under Sections 7, 8, 47 and 48 and other provisions of the Baltimore City Charter (1938 Edition) relating to the city's "title" to "land under water." Defendant claims the right to make such improvements, without paying for the right, under Section 47 of Article 54 of the Code of 1939. Plaintiff argues (1) that it holds absolute title to the land in the bed of the Patapsco, and therefore has the proprietary right to charge defendant for use of that land, and (2) that it has absolute control over that land, and under Section 7 "title" refers to such control, and therefore it has the power to charge defendant for the privilege of using the land.

These opposing contentions present a question of statutory construction. The legislative intent may best be found in the words of the statutes, the context and the

occasion, without undue refinements or generalizations about things (such as franchise taxes) which defy generalization. Either of the opposing contentions is a *possible* legislative intent. Under power to regulate commerce the federal government, with no title at all, may require a riparian owner to pay for a license to use his own property. *United States v. Appalachian Electric Power Co.,* 311 U. S. 377, 427, 428, 61 S. Ct. 291, 85 L. Ed. 243. The City of Baltimore may exact payment for a franchise to use turnpike roads, owned by turnpike companies, and streets owned by individuals but used by the public as highways. *Patapsco Electric Co. v. Baltimore,* 110 Md. 306, 72 A. 1039. On the other hand, the Legislature, in imposing a franchise tax measured by use of streets, may exclude turnpike roads and private rights of way from the measure of the tax. *Park Tax Case,* 84 Md. 1, 35 A. 17, 33 L. R. A. 503; *City of Baltimore v. United Rys. & Electric Co.,* 107 Md. 250, 68 A. 557, 14 L. R. A., N. S., 805. A statute which granted a state-wide franchise that has not been exercised may be repealed *pro tanto* by one which provides that no use shall be made of the streets of a particular city without the consent of the city, "subject to such franchise tax and regulations" as the city may prescribe. *Kelly v. Consolidated Gas, Electric Light & Power Co.,* 153 Md. 523, 138 A. 487, 490. But the lawful exercise of a franchise cannot be prevented by the City of Baltimore by refusing a permit. *State ex rel. v. Latrobe,* 81 Md. 222, 232-234, 31 A. 788; *Hooper v. Baltimore City Passenger Ry. Co.,* 85 Md. 509, 514, 37 A. 359, 38 L. R. A. 509. In each instance (in the absence of constitutional questions) the legislative intent is controlling.

Plaintiff's contentions are based on new provisions of the "New Charter" of 1898, Acts of 1898, Ch. 123. To construe these new provisions the powers of the city before 1898 should be considered.

The Act of 1745, Ch. 9, provided: "That all Improvements of what Kind soever, either Wharfs, Houses, or other Buildings, that have, or shall be made out of the

Water, or where it usually flows, shall as an Encouragement to such Improvers, be for ever deemed the Right, Title and Inheritance of such Improver or Improvers, their Heirs and Assigns for ever." This provision was repealed by adoption of the Code of 1860. By the Act of 1862, Ch. 129, Sections 46, 47 and 48 of Article 54 of the Code of 1939 were enacted. Section 47 provides: "The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

The Act of 1783, Ch. 24, "An Act appointing wardens for the port of Baltimore-town, in Baltimore county," recited that "it is of importance to the state, that proper persons should be appointed to preserve the navigation of the bason and harbour of Baltimore-town, in Baltimore county," and provided in Section 8: "That no wharf or wharves shall be run out, made, altered, enlarged, or extended, * * *, so as to divert the course of the said channel, obstruct the harbour or bason, or to the injury of the same; and that no person or persons shall make, alter, or extend, a wharf or wharves, * * *, without laying before the said wardens a plan of his or their intended wharf or wharves, and without consent first obtained, under the seal of the board, to carry the same into effect; * *."

The Act of 1784, Ch. 39, required that a correct survey of the town be made, and provided that the lots and streets, when so laid out anew, "and the ground and other improvements made and extended out of the water," when surveyed and laid off according to the act, should be part of the town, as if originally included therein. "Saving to all persons whatsoever their right of property in any of the said ground so made and extended as

aforesaid, and in the lots or land from which such ground may be made and extended, and *the right to make and extend ground* as aforesaid, and the right to the water or land covered by water, which rights are not meant or intended in any manner to be interfered with, determined on, or affected by, this act." (Italics supplied).

The original charter of the City of Baltimore (Acts of 1796, Ch. 67) in Section 9 empowered the city to pass all laws and ordinances necessary "to provide for the preservation of the navigation of the bason, and Patapsco River within the limits of the City of Baltimore, and four miles thereof," and in Section 10 transferred to the city "all powers and authorities" of the port wardens. The above provisions of Section 8 of the Act of 1783 were re-enacted practically *verbatim* in the Codes of 1860 and 1888 and the New Charter of 1898, except that instead of the port wardens the mayor and city council was mentioned in the Code of 1860, and the Harbor Board in the New Charter. Code of 1860, Sec. 267; Code of 1888, Sec. 351; Act of 1898, Sec. 463. By the Act of 1908, Ch. 170, p. 611, the Harbor Engineer was substituted for the Harbor Board and verbal changes were made. Charter 1938, Sec. 558. The above provision of Section 10 of the original charter was retained practically *verbatim* in the Code of 1860 and was enlarged in geographical scope in 1884 and again in 1908. Code of 1860, Sec. 703; Code of 1888, Sec. 343; Act of 1898, Sec. 6; Charter 1938, Sec. 6 (8).

Originally much of the shore line of the Baltimore Harbor was concave. Improvements by making land out of the water, laying out streets and building wharves and piers, to a considerable extent made rectangular harbor lines out of a curving shore. Both the natural and the improved state of the harbor early gave rise to (1) conflicting claims of riparian owners to improvements and to the right to make improvements and (2) need for governmental regulation (a) to preserve navigation and (b) to ration space on concave lines so that riparian owners may make use of their own rights and not ob-

struct and nullify each other's rights. The State (1) left questions of title to the courts, retained title to land under water until acquired by riparian "improvers" (including the City of Baltimore) under the Act of 1745, and gave no title to the city except as an "improver," and (2) "delegated" its "full legislative power" to the city "for local harbor regulation," (a) to preserve navigation and (b) to ration space for "improvements." *Cahill v. Mayor and City Council of Baltimore,* 173 Md. 450, 455, 459, 460, 196 A. 305.

The delegation of power of governmental regulation for these two purposes was complete in the original charter of 1796, including the former "powers and authorities" of the port wardens under the Act of 1783. *Supra.* The rights of riparian owners subject to such governmental regulation, were reaffirmed in the Act of 1784, *Supra.* Under the Act of 1862 such rights are substantially the same as under the Act of 1745, but are further protected by the provisions of Section 48, Art. 54, Code of 1939: "No patent hereafter issued out of the land office shall impair or affect the rights of riparian proprietors, as explained and declared in the two preceding sections; and no patent shall hereafter issue for land covered by navigable waters." We shall assume, without deciding, that Section 48 could be repealed, and also Section 47 to the extent that improvements have not actually been made.

Under the Act of 1745—or 1862—"the riparian owner had no vested title to the land covered by water immediately in front of his property, nor to the improvements built out of the water, until the improvements had been actually completed. *Giraud's Lessee v. Hughes,* 1 Gill & J. 249." *Brady v. Baltimore,* 130 Md. 506, 510, 101 A. 142, 143; *Cahill v. Mayor and City Council of Baltimore, supra,* 173 Md. 456, 196 A. 305. The required consent of the city agencies was given by the establishment of limiting lines. The power to establish such a line includes power to change it. The right to build piers to a particular pierhead line, conferred by an ordinance

of 1880, "was a privilege subject to revocation at any time before it was acted upon, and the ordinance of 1881, which repealed all ordinances inconsistent therewith [and established a new line], was a revocation of this privilege." *Classen v. Chesapeake Guano Co.,* 81 Md. 258, 267, 31 A. 808, 809; *Cahill v. Mayor and City Council of Baltimore, supra,* 173 Md. 456, 457, 196 A. 305.

Subject to such governmental regulation by the city (and by the federal government), the reparian owner's right to make improvements in the water was "a franchise; a vested right, peculiar in its nature; a *quasi* property, of which [he] could not lawfully be deprived, without [his] consent." *Casey's Lessee v. Inloes,* 1 Gill 430, 501, 39 Am. Dec. 658; *Baltimore & O. R. Co. v. Chase,* 43 Md. 23; *Horner v. Pleasants,* 66 Md. 475, 477, 7 A. 691; *Brady v. Baltimore,* 130 Md. 506, 510, 511, 101 A. 142. Riparian owners had the right "to extend or improve out [their] lot *to the limit prescribed by the city authorities,* and according to the well settled law of this State, they could not be deprived of this right without their consent." (Italics supplied.) *Mayor, etc., of Baltimore v. St. Agnes Hospital,* 48 Md. 419, 421. "These rights, thus secured, [by the Act of 1862] are valuable; they are property, according to repeated decisions; and of which the owner cannot be deprived without his consent or by other competent legal means. *Dugan v. Mayor, etc., of Baltimore,* 5 Gill & J. 357 367; *Casey's Lessee v. Inloes,* 1 Gill 501, 39 Am. Dec. 658; *Baltimore & O. R. Co. v. Chase,* 43 Md. 23; *Buccleugh v. Met. Board of Works,* 5 H. L. 418. And whenever those rights are invaded, or their enjoyment obstructed, the owner is entitled to his remedy for redress, as in other cases of the violation of the rights of property." *Garitee v. Mayor, etc., of Baltimore,* 53 Md. 422, 433; *Culley v. Hollis,* 180 Md. 372, 374, 375, 25 A. 2d 196. When reparian property is taken by the city, compensation must include the value of these rights. *Marchant v. Baltimore,* 146 Md. 513, 126 A. 884. In *Tome Institute v. Crothers,* 87 Md. 569, 40 A. 261, 266,

it was held that a riparian owner could sell his "water privilege" under the Act of 1824, Ch. 33, and retain his land. The Act of 1824 gave to riparian owners at Port Deposit "a right of the same description" as the right to improve under the Act of 1745.

In *Mayor, etc., of Baltimore v. St. Agnes Hospital, supra,* it was held that improvements made by the city in front of an unopened paper street (to which it had no title) on the hospital's land, vested in the hospital, not in the city. In *Garitee v. Mayor, etc., of Baltimore, supra,* a riparian owner was held entitled to damages from the city for obstructing access to his property by dumping in front of it mud dredged from the basin. It was contended by the city that an Act of 1872, authorizing it to widen and deepen the ship-channel, repealed by implication a statute which prohibited throwing earth into the river. The court said, "Such construction, however, is supported by no authority, and cannot for a moment be maintained." 53 Md. 435.

Thus statutes prior to 1898 furnish no basis—either (1) right of property in land under water or (2) legislative power — for a charge by the city for the exercise by riparian owners of the rights given them by the State. Plaintiff apparently does not dispute this conclusion.

Section 7 of the New Charter of 1898 provides: "The title of the Mayor and City Council of Baltimore, in and to its water front, wharf property, land under water, public landings, wharves, docks, highways, avenues, streets, lanes, alleys and parks, is hereby declared to be inalienable." Section 8 provides: "The Mayor and City Council of Baltimore may grant for a limited time, and subject to the limitations and conditions contained in this Charter, specific franchises or rights in or relating to any of the public property or places mentioned in the preceding section; * * *." The grant must comply with certain requirements. Section 9 makes special provisions for franchises or rights "in relation to any highway, avenue, street, lane or alley." Section 10

requires publication "before any grant of the franchises or right to use any highway, avenue, street, lane or alley, *or other public property,*" "*except as provided in the proviso to Section 47* [originally 37]." (Italics supplied to indicate amendment in 1900, c. 109.) Section 13 provides that nothing in the Charter shall prevent the city from "disposing of any building or parcel of land no longer needed for public use," and prescribes procedure. Section 47 [originally 37] provides: "Before any grant shall be made by the Mayor and City Council of Baltimore, of the franchise or right to use any street, avenue, alley or highway, or the grant of the franchise or right for the use of any public property mentioned in Section 7 of this Charter, the proposed specific grant, *with the exceptions hereafter in this Section made,* shall be embodied in the form of an ordinance, * * *." The Board of Estimates shall fix in the ordinance the compensation for the franchise or right at the largest amount it may be able to obtain for it. "Provided, that the right to use the streets, avenues, alleys or public property, by any person or body corporate for steps, porticoes, bay windows, bow windows, show windows, signs, columns, piers or other projections or structural ornaments of any character except so far as the same may be prohibited by law, and covered vaults, covered areaways, drains, drain-pipes, or any other private purpose not prohibited by law and not being a franchise or right requiring a formal grant by ordinance under the terms of this section, may be granted by the Board of Estimates for such an amount of money and upon such terms as the said Board may consider right and proper." (Proviso added in 1900, c. 109, and amended in 1906, c. 357.) In this context "piers" does not mean a marine structure, but, like "columns," an architectural support. Section 48 [originally 37A, enacted by Acts of 1908, Ch. 151, p. 591] provides: "Anything in the preceding sections of this Charter to the contrary nothwithstanding, where ordinances now stand referred, or shall hereafter stand referred, to the Board of Estimates of the Mayor and City

Council of Baltimore, in the manner provided for in the preceding section of this Charter, granting franchises or rights in the water front, wharf property, land under water, public landings, wharves or docks, of the Mayor and City Council of Baltimore, or in any portion or portions thereof, the said board shall be empowered to fix the compensation for the franchise or right in their discretion at such sum as they shall deem reasonable and adequate, * * *." Special provisions are made "where there are two or more applicants for the franchise or right," but no provision is made for minor privileges as in Section 47.

Plaintiff contends that Section 7 of the Charter is a grant by the State to the city of title to all the land under water in the Baltimore harbor and Sections 8, 47 and 48 empower the city to grant—and to exact compensation for—rights in this land; and that such a grant by the State to one of its political subdivisions is not subject to the ordinary rule of strict construction of a grant by the State. Plaintiff argues (somewhat inconsistently) that otherwise "the title of the City to its land under water" would be meaningless, because (a) the city could not grant at all its rights as a riparian owner under the Act of 1862 (but see *Tome Institute v. Crothers, supra)* and (b) the city could in any event dispose of such rights under Section 13 as "parcels of land no longer needed for public use."

We might doubt the correctness of relaxing the rule of strict construction in a case of a blanket grant of title which has been retained for over 300 years and has been the basis of valuable rights given to riparian owners for 200 years—except the two years from 1860 to 1862. See also *Gaither v. Jackson,* 147 Md. 655, 128 A. 769. But there is no grant by the State to construe. By no process of construction can the declaration that "the City's title to its land under water is inalienable" mean that the State's title to its land under water is granted to the city. If the exact content of "land under water" is not clear, the declaration concerning it is.

"Water front, wharf property, land under water, public landings, wharves and docks" are "public property." "Title" to "public property" is ownership. Section 7 grants nothing to the city, but makes property owned by the city inalienable. Sections 8 to 13, inclusive, 47 and 48 authorize grants of franchises or rights, and disposition of property, which constitute exceptions to the prohibition in Section 7.

The words of Section 7 accurately express its purpose. The purpose of the "franchise" provisions of the New Charter was not to give the city new power to grant franchises, but to restrict the exercise of power which the city previously had *(North Baltimore Pass. Ry. Co. v. North Ave. Ry Co.,* 75 Md. 233, 238, 239, 23 A. 466; *Lake Roland El. Ry Co. v. Baltimore,* 77 Md. 352, 364— 365, 26 A. 510, 20 L. R. A. 126) and had exercised without such restrictions. The New Charter Commission, in its report to the General Assembly, stated among principles relating to municipal government by which it had been guided: "To grant the use of the streets and other public property for limited terms, and to the highest bidder, subject to the control and regulation of the City during the period of the grant."

The franchise provisions relate primarily to streets and highways and also to certain "public property." Not all streets and highways are "public property." Streets and highways are "public places" (Section 8) and are mentioned *eo nomine* in Sections 9, 10 and 47. Section 9 (and originally Section 10) is applicable only to streets and highways; Section 48 is applicable only to specific "public property," *viz.,* all kinds of "water" property mentioned in Section 7.

The exact scope of "the City's title to its land under water" need not now be decided. It may mean or include, as Judge Tucker says, (a) land covered by city-owned improvements or (b) a riparian owner's right to improve under the Act of 1862. It may also mean or include exactly what it says. For over 200 years, until 1862, the State (and the proprietor or the colony) pa-

tented to individuals, subject to the public rights of navigation and fishery, fee-simple title to land under water. *Browne v. Kennedy,* 5 Har. & J. 195, 203-207, 9 Am. Dec. 503. Reported cases in this court show instances of such patents as early as 1663 *(Casey v. Inloes, supra)* and as late as 1861. *Linthicum v. Coan,* 64 Md. 439, 2 A. 826, 54 Am. Rep. 775. On June 5, 1905, seven years after the enactment of the New Charter and eleven years before the city began to claim "minor privilege charges" for the exercise of rights under the Act of 1862, the State conveyed to the city by deed, for $15,000, pursuant to the special Act of 1904, Ch. 581, "all the ground and premises, whether fast land or land against or under the water," between Pratt Street on the north and "the water of the basin or harbor" on the south, "especially all the State's right, title and interest in and to the bed of every street, lane and alley bounded on, adjoining or running through the said property * * * and the land adjacent thereto which is covered by the water." If land under water is not within Section 13 (a question which we do not decide), the prohibition of Section 7 operates, like the Act of 1862, to prevent private traffic in such land, and thereby to protect the rights of riparian owners. Every other kind of "water" property mentioned in Section 7 or 48 is city-owned "public property." Whatever "the city's title to its land under water" may include, it does not include the State's title or the title of riparian owners (other than the city).

As we have said, "title" to "public property" is ownership—not territorial jurisdiction under annexation acts, or "dominion," or legislative power to regulate or "control." As recently as 1935, in a case involving Sections 7, 10, 13 and 37, this court applied the rule "that municipal corporations have only such powers as have been conferred upon them by the Legislature, and these are to be strictly construed. To doubt such power in a given case is to deny its existence." *Hanlon v. Levin,* 168 Md. 674, 677, 179 A. 286, 287. Power delegated to a mu-

nicipal corporation to "regulate" or to "license and regulate" does not include power to impose a license tax or fee to raise revenue that bears no reasonable relation to the expense of regulation. *Cambridge Com'rs v. Cambridge Water Co.*, 99 Md. 501, 503, 58 A. 442, 2 Ann. Cas. 311; *Vansant v. Harlem Stage Co.*, 59 Md. 330, 333-338; *State v. Rowe*, 72 Md. 548, 553, 554, 20 A. 179. This court has already decided that the city's police power to regulate use of the streets and exercise of street franchises (including minor privileges) cannot be exercised for unauthorized revenue purposes. In the Minor Privilege Cases, 131 Md. 600, 619-622, 102 A. 1014, it was held that the Board of Estimates has no power to impose charges for minor privileges granted before 1900; and that permits issued, before or since 1900, without reserved power of revocation, are revocable only in the exercise of the police power, and cannot be revoked in professed exercise of the police power for the real purpose of re-granting them for increased compensation. This attempt to obtain revenue from minor privileges in streets was initiated in 1916, about the same time as the attempt to collect minor privilege charges for the exercise of rights under the Act of 1862. 131 Md. 603, 604, 102 A. 1014.

In *City of Baltimore v. Baltimore & P. Steamboat Co.*, 104 Md. 485, 65 A. 353, the city owned a wharf and riparian rights south of Pratt Street, the steamboat company a wharf and riparian rights east of Light Street. The steamboat company wharf had been built under an act of 1796 and the required consent of the city. Before 1796 former owners of the city property had made improvements into the water; before the city gave its consent to the Light Street wharf, there was a public wharf on the Pratt Street property. The steamboat company contended that the Act of 1796 and the city's consent gave it rights superior to those of the owners of the Pratt Street property. The court held that the Legislature by the Act of 1796 could not have intended to deprive the owners of already improved Pratt Street

lots of their riparian rights, and the city by its consent could not have intended to grant rights to the Light Street owners superior to the public right of navigation in front of the Pratt Street wharf, but that the Legislature intended to grant to the owners of the wharves on Light Street and Pratt Street concurrent rights to use the waters of the basin. The court said that any rights of the steamboat company to extend its piers "are subject to the limitations and restrictions imposed by law, including those imposed by law upon the city's power to grant the permit or inherent in the nature of its title to the navigable waters into or over which the structure designated in the permit is intended to be built. The title and power of the city in relation to such waters, being derived from the state, cannot be greater than those of the state itself," 104 Md. 493, 65 A. 356. The city's title was a riparian owner's title, not the State's full title, but like the State's title was subject to the public right of navigation. The city's power to consent was likewise subject to the public right of navigation and was also limited by the intent of the Legislature in the Act of 1796.

A power in the city to exact compensation for a right given by the State would be a power to destroy the right. The city has no such power, either because of its power to regulate, which it obtained in its original charter of 1796, or because of any new provision in the New Charter of 1898.

As the city had no right or power to exact these minor privilege charges, any contract to pay effected by acceptance of the permit from the Board of Estimates was without consideration and cannot be enforced against the defendant.

*Judgment affirmed, with costs.*